AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
**2/24/2022**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ B _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
FEB 2 4 2022
CENTRAL DISTRICT OF CALIFORNIA
BY _____ MJV _____

United States of America,

v.

Reddy Budamala,

Defendant.

Case No.    2:22-mj-00758-duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 30, 2020, in the counties of Los Angeles and Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |

This criminal complaint is based on these facts:

**Please see attached affidavit.**

☒ Continued on the attached sheet.

_/S/ Drew Cienfuegos_
Complainant's signature

IRS-CI Special Agent Drew Cienfuegos
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  2/24/22

Judge's signature

MARIA A. AUDERO
Printed name and title

City and state:   Los Angeles, California

**AFFIDAVIT**

I, Drew Cienfuegos, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.   I make this affidavit in support of a criminal complaint against and warrant to arrest **REDDY BUDAMALA** ("**BUDAMALA**") for a violation of 18 U.S.C. § 1341 (wire fraud).

2.   The facts set forth in this affidavit are based on my personal observations, training and experience, and information obtained from other agents and witnesses. The beliefs I express in this affidavit are based on my training, experience, knowledge of the investigation, and reasonable inferences I have drawn from the foregoing sources of information.

3.   This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and warrant and does not purport to set forth all of my knowledge of or investigation in this case.

4.   Unless stated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, unless stated otherwise, all dates and amounts in this affidavit are approximations, and the words "on or about" and "approximately" are omitted for clarity.

## BACKGROUND OF AFFIANT

5.   I am a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI"). I have been with IRS-CI since October 2017 and have been a special agent since March 2019. As an IRS-CI agent, I have conducted and

participated in investigations concerning violations of criminal tax, fraud, and money laundering statutes. I have executed search warrants, interviewed witnesses, and conducted surveillance.

6.    My education includes a bachelor's degree in accounting and a master's degree in taxation from the University of Washington. I am a licensed certified public accountant in the State of New York. I attended the Criminal Investigator Training Program and the Special Agent Basic Training program at the Federal Law Enforcement Training Center. I have attended trainings on cyber-dependent and cyber-enabled criminal activity. Through my training, education, and experience, I am familiar with the methods financial criminals use to plan, execute, and conceal their illicit activities.

<b>SUMMARY OF PROBABLE CAUSE</b>

7.    Between January and August 2019, **REDDY RAGHAV BUDAMALA** (**"BUDAMALA"**) formed and acquired Hayventure LLC ("Hayventure"), Pioneer LLC ("Pioneer"), and XC International LLC ("XC International") (collectively **"BUDAMALA**'s companies"), three shell companies with no business operations.

8.    Following the outbreak of COVID-19, **BUDAMALA** submitted to the Small Business Administration ("SBA") seven Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") loan applications on behalf of Hayventure, Pioneer, and XC International (collectively the "SBA loans applications"). **BUDAMALA** falsely represented to the administrating banks (which were all financial institutions under federal law) that his

companies employed dozens of individuals and earned millions of dollars in revenue, and that he needed the money for payroll and business expenses. The SBA and its lenders funded six of the loans and disbursed $5,151,497 to **BUDAMALA**'s companies. **BUDAMALA** applied to have several of the loans forgiven and falsely represented that he used the SBA money entirely for payroll.

9.    The evidence overwhelmingly shows that the loan applications were false. The listed addresses for the companies are bogus, nonexistent, or residential. Though **BUDAMALA** submitted IRS Forms 941 (employment tax returns) for each of his companies in support of the applications, the IRS has no records for Hayventure, Pioneer, or XC International. The states where **BUDAMALA**'s companies purportedly operated have no records of those companies paying wages to any employees. Bank records for the companies reflect no significant business income or operating expenses. And in February 2021, **BUDAMALA** told a special agent from the State Department that he wanted a United States passport because he thought it would help him get a job.

10.   Once the SBA loans were funded, **BUDAMALA** used the money for personal expenditures. For instance, **BUDAMALA** used the loan proceeds to fund the purchase of a $1.247 million investment property in Los Angeles,[1] the purchase of a $597,585 property in Malibu, a $970,000 investment in an EB-5 fund, a $250,000 private placement investment, and a nearly $3 million investment in **BUDAMALA**'s personal TD Ameritrade account.

---

[1] Unless stated otherwise, all cities I refer to in this affidavit are located in the Central District of California.

11.   In February 2022, agents executed seizure warrants on
several of **BUDAMALA**'s financial accounts, search warrants on the
email accounts linked to **BUDAMALA** and his companies, and a
search warrant on **BUDAMALA**'s residence on Almond Tree Lane in
Irvine, California ("the Almond Tree Address"). During the
execution of the Almond Tree search warrant, **BUDAMALA** confessed
that the SBA loans he filed were false, that his companies had
no full-time employees, and that he spent the SBA loan proceeds
on personal expenditures. **BUDAMALA** was detained when he
attempted to flee the country later that night.

**STATEMENT OF PROBABLE CAUSE**

12.   Based on records, witness interviews, my review of
electronic communications, and my knowledge of this
investigation, I know the following:

**I.    *The formation of XC International, Hayventure, and
        Pioneer***

13.   On January 15, 2019, the Hayventure articles of
organization were filed with the California Secretary of State.
The address listed on the registration is 506 South Spring
Street, Unit 13308, Los Angeles, California ("the Spring Street
address"). There is a post office located at 506 South Spring
Street, and postal records show that at one point **BUDAMALA**
rented PO Box 50730 from that office, though never a PO Box with
the number 13308. Postal records show no accounts for Hayventure
in the area of the Spring Street office. Other than the articles
of organization, there are no other filings for Hayventure with
the California Secretary of State.

14.   On April 17, 2019, articles of organization for XC International were filed with the Wyoming Secretary of State. On July 29, 2020, **BUDAMALA** purchased XC International for $1,595, listing his residence as house on Bright Hollow in Irvine, California ("the Bright Hollow address").[2] On August 10, 2020, XC International filed resolutions to sell XC International, appoint **BUDAMALA** as manager, and authorize **BUDAMALA** to open a bank account in the name of XC International. The next day Wyoming Corporate Services emailed **BUDAMALA** the XC International corporate documents.

15.   On August 22, 2019, the articles of organization for Pioneer were filed with the Wyoming Secretary of State. On June 4, 2020, Wyoming Corporate Services invoiced **BUDAMALA** for $1,035 for a California Aged LLC and sent an email to **BUDAMALA** confirming the purchase. **BUDAMALA** used Citibank 4850 (**BUDAMALA**) to pay the invoice.[3] On June 4, 2020, Pioneer filed resolutions to sell Pioneer, appoint **BUDAMALA** as manager, and authorize

---

[2] Evidence shows that **BUDAMALA**'s wife, with whom **BUDAMALA** is separated and in the process of divorcing, resides at the Bright Hollow address. On October 26, 2020, a grant deed was filed with Orange County transferring the Bright Hollow property from **BUDAMALA** and Individual 1 (described as husband and wife and joint tenants) to Individual 1 as her sole and separate property. Moreover, expenses from BOA 8343, one of **BUDAMALA**'s bank accounts (described below), suggest that **BUDAMALA** divorced or is divorcing his wife. For example, between May 26, 2020 and November 18, 2020, there are seven transactions from this account to "online divorce service."

[3] For the purpose of this affidavit, I refer only to the last four digits of account numbers and describe the names on the accounts parenthetically.

**BUDAMALA** to open an account in the name of Pioneer. That day, **BUDAMALA** emailed Wyoming Corporate Services to ask that the address for Pioneer be changed from the Bright Hollow address to 1920 Hillhurst Avenue, Unit 1026, Los Angeles, California ("the Hillhurst Address"). **BUDAMALA** also provided Wyoming Corporate Services with a copy of his identification and declared that Pioneer's business purpose was technology consulting and software services. In response Wyoming Corporate Services emailed Pioneer's corporate documents to **BUDAMALA**. On June 5, 2020, a statement of information was filed with the California Secretary of State listing **BUDAMALA** as manager and the business location as the Hillhurst Avenue address. Records show that the Hillhurst Avenue address was a private electronic PO Box subscribed to **"RAGHAV REDDY"** who uses phone number 971-279-6878 ("the 6878 number") and resides in Irvine, California.

**II.   *SBA loan applications***

**a.   Hayventure PPP loan (April 30, 2020)**

16.   On April 30, 2020, Hayventure applied to Celtic Bank for a PPP loan. On the application **BUDAMALA** represented that Hayventure operated in the financial industry, and had revenue of $500,000, 10 employees, and monthly payroll of $94,639. **BUDAMALA** also reported that Hayventure was located at the Spring Street location and that he was the sole owner of the company. As the point of contact, **BUDAMALA** stated that the Almond Tree residence was his personal residence.

17.   **BUDAMALA** electronically initialed the SBA's standard PPP certifications and signed the application. The

certifications generally provide that the company was in operation on February 15, 2020, the company had wage-earning employees, the loan proceeds would be used to retain employees and for certain business expenses, and that the information on the application and supporting documents was accurate ("the PPP certifications"). In addition to his identification, **BUDAMALA** provided the following documentation in support of the Hayventure PPP loan application:

- What appeared to be a March 2020 bank statement from Azlo 5756 (Hayventure). The statement reflected a beginning balance of $325,143, an ending balance of $345,133, and two transactions (a credit for $145,123 and a debit for $125,133). Records from this account show that the actual March 2020 statement for Azlo 5756 reflected beginning and ending balances of $0 with no transactions. The statement **BUDAMALA** submitted appears on the left below. The actual statement appears on the right.




- What appeared to be IRS Forms 941 for each quarter in 2019. The forms reflected that each quarter Hayventure had 13 employees, and quarterly wages of $283,916.40. Each Form 941 lists **BUDAMALA** as the president and bears **BUDAMALA**'s signature. As described below, the IRS has no records for Hayventure.

18.  Celtic Bank approved the application and generated a promissory note with a principal amount of $236,597. On April

30, 2022, **BUDAMALA** electronically signed the note, certifying that "all supporting documents and forms" used to obtain the loan were "true and accurate in all material respects" and that acknowledging that it was a crime to make "any known false statements" in connection with the loan. On May 4, 2020, Celtic Bank funded the loan via an electronic ACH transfer of $236,597 to Azlo 5756 (Hayventure).

19.   On September 14, 2021, **BUDAMALA** signed and filed an application to have the loan forgiven. **BUDAMALA** represented that Hayventure had 10 employees at both the time the loan was funded and the time of the forgiveness application, and that he used the entire loan amount for payroll. In support of the forgiveness application **BUDAMALA** submitted the following payroll summaries:

- The first summary covered the period from April 30, 2020 to October 14, 2020. This summary listed 13 employees, with names like "Clive Owens" and "Ron Hubert," but included no social security numbers.[4] **BUDAMALA** is listed as an employee on the summary, and every employee is listed as a business process manager who worked 960 hours during the covered period, had no paid time off or overtime, and made exactly $39,705.60.

- The second summary covered the period January 1, 2020 to December 31, 2020. This summary listed 13 employees with the same names as the first summary. Each employee was again listed as a business process manager, though on the second summary the employees each worked 2,112 hours and made $87,358.89.

---

[4] **BUDAMALA** appears to have fabricated names or slightly changed the names of famous people, like actor Clive Owen or Scientology founder L. Ron Hubbard.

20.   When applying for forgiveness, **BUDAMALA** certified that the money was used for business costs, that at least 60 percent of the loan funds were used for payroll, and that the forgiveness application was "true and correct in all material respects." Celtic Bank approved the forgiveness.

### b.   Hayventure EIDL loan (June 18, 2020)

21.   On June 18, 2020, **BUDAMALA** electronically submitted an application for an EIDL loan on behalf of Hayventure. **BUDAMALA** represented that Hayventure used Azlo 5756, was located at the Spring Street address and used the 6878 phone number, and had 13 employees. **BUDAMALA** also stated that he resided at the Bright Hollow address, was a United States citizen,[5] and owned 90 percent of Hayventure. On June 22, 2020, the SBA disbursed the loan proceeds in the amount of $149,900 to Hayventure via a money transfer to Azlo 5756.

### c.   Pioneer PPP loan (first and second draw)

22.   On June 10, 2020, **BUDAMALA** electronically applied to Radius Bank for a PPP loan on behalf of Pioneer. On the application, **BUDAMALA** represented that the company was located at the Hillhurst Avenue address, had 33 employees and monthly payroll of $264,000, was established on August 22, 2019, and used the phone number 424-333-5458 ("the 5458 number"), which AT&T records show to be subscribed to **BUDAMALA**. **BUDAMALA** also stated on the application that he resided at the Bright Hollow address, and that he was the sole owner of Pioneer. **BUDAMALA**

---

[5] Immigration records show that **BUDAMALA** is not a citizen.

initialed the PPP certifications and electronically signed the application.

23.   The documentation **BUDAMALA** submitted in support of the loan application included his identification, Pioneer's California Secretary of State registration, Pioneer's purported operating agreement (dated January 20, 2020), and five Forms 941 for Pioneer that covered the quarters in 2019 and the third quarter of 2020. Each Form 941 reflected that Pioneer had 33 employees and total quarterly wages of $792,000. Each Form 941 also bears **BUDAMALA**'s signature, his title as "director" of the company, and the 5458 number as a means of contacting Pioneer. As described below, Pioneer never filed any Forms 941 with the IRS.

24.   On June 19, 2020, Radius generated a promissory note for a PPP loan in the amount of $660,000. **BUDAMALA** electronically signed the note the same day. On June 24, 2020, the loan proceeds were disbursed via ACH transfer to Azlo 7635 (Pioneer). On October 7, 2020, **BUDAMALA** applied to have the loan forgiven, representing that Pioneer had 33 employees both at the time of the loan and forgiveness applications, and that Pioneer used all proceeds of the loan on payroll costs. **BUDAMALA** electronically signed the forgiveness certifications.

25.   On January 20, 2021, **BUDAMALA** electronically submitted an application for a second draw of PPP loan funding. The information **BUDAMALA** represented on this application was almost identical to the information on the first Pioneer loan application, including that the company was located at the

Hillhurst Avenue address, and had 33 employees and monthly
payroll of $264,000, and that **BUDAMALA** was the sole owner of
Pioneer. **BUDAMALA** initialed the PPP certifications. This time
the supporting documentation consisted of a profit and loss
statement for Pioneer that reflected $1,027,026 of revenue and
$792,000 of wage expenses in the fourth quarter of 2019, and
$790,020 of revenue and $792,000 of wage expenses in the fourth
quarter of 2020. **BUDAMALA** electronically signed the PPP
certifications. On March 3, 2021, $660,000 in additional loan
proceeds were disbursed via ACH transfer to Azlo 7635 (Pioneer).

### d.   XC International PPP loan (first draw and attempted second draw)

26.   On August 6, 2020, **BUDAMALA** electronically applied to
Newtek Small Business Finance for a PPP loan on behalf of XC
International. On the application **BUDAMALA** represented that the
company was located at 3200 Park Center Drive, Costa Mesa,
California ("the Park Center address"), had 42 employees and
monthly payroll of $637,000, and used the phone number 805-534-
5293 ("the 5293 phone number").[6] **BUDAMALA** also stated on the
application that he resided at the Bright Hollow address and
owned 95 percent of XC International. **BUDAMALA** initialed the PPP
certifications and electronically signed the application.

---

[6] The Park Center address is an office building in Costa
Mesa. I reviewed the building directory and found no entry for
Hayventure, Pioneer, XC International, or **BUDAMALA**. WeWork, a
shared office space, has a location in the building, though
WeWork has no records for **BUDAMALA**'s companies and only one
account for "Raghavender Reddy" located outside the United
States.

27.   Regarding documentation, **BUDAMALA** submitted his identification, a forged letter purporting to be from Azlo confirming that XC International's bank account number is 6769135756 (which records show to be Hayventure's account number), a payroll summary for 42 employees covering 2019, and a Form 941 for the first quarter of 2019 reflecting that XC International had 42 employees and total quarterly wages of $2.211 million.[7] The form bears the name and signature of partner Kevin Diaz, and lists the 5293 number as Diaz's contact number. Diaz's signature on the form is identical to **BUDAMALA**'s signature on other forms. On August 6, 2020, **BUDAMALA** signed a promissory note for the loan, which had a principal amount of $1,592,500. Four days later the loan proceeds were deposited into Azlo 5756 (Hayventure). The forged letter appears as follows:



---

[7] As described below, XC International has never actually filed a tax return or Form 941.

28.   On February 2, 2021, **BUDAMALA** applied for a second draw on the XC International loan in the amount of $1,592,500. In support of this loan, **BUDAMALA** represented that XC International was located at the Park Center address, had 42 employees and a monthly payroll of $637,000, and earned $2,541,750 and $1,906,312.50 of revenue in the fourth quarter of 2019 and first quarter of 2020, respectively. **BUDAMALA** also provided that his address was the Bright Hollow residence (spelled "Bright Holw" on the application), and that he was the 95 percent owner of XC International. **BUDAMALA** initialed the PPP certifications and electronically signed the application.

29.   In support of the second draw **BUDAMALA** submitted a copy of his identification, the payroll summaries he provided during the first draw application process, new payroll summaries for 2020, the XC International operating agreement, profit and loss statements for XC International dated October 1, 2020 and December 31, 2020 that appeared identical (except for the dates), and Forms 941 for each quarter in 2020.[8] Each of the Forms 941 reflected that XC International had 42 employees and total quarterly wages of $2.211 million. Unlike the Forms 941 submitted for the first draw, the 2020 XC International Forms

---

[8] The payroll summaries would be unusual for a legitimate company. The summary attached to the initial application reflected only three positions -- specifically finance mangers, senior managers, and directors -- who earned between $124,800 and $145,875 (i.e., every employee was at least a manager). The payroll summary attached to the second draw application reflected that finance managers earned $200,640 per year and senior managers and directors earned $221,760 per year.

941 bear **BUDAMALA**'s signature, **BUDAMALA**'s title as manager, and the same contact number listed for Kevin Diaz (the 5293 number).

30.   Newtek noticed irregularities with the documents **BUDAMALA** provided during the second draw process. On February 19, 2021, in a recorded conversation, a Newtek employee confronted **BUDAMALA** with the fact that the wages on the Forms 941 **BUDAMALA** provided add to approximately $8.8 million but that the wages on the summaries totaled approximately $5.6 million. **BUDAMALA** responded that he would work with his "team" to resolve the issue. Five days later, on February 24, 2021, **BUDAMALA** told Newtek that the discrepancy was because the company "started in April" 2019. When the Newtek employee asked for clarification on what he meant by "started," **BUDAMALA** said that April 2019 was when XC International "was established." The Newtek employee pointed out that **BUDAMALA** submitted a Form 941 for XC International that covered the first quarter of 2019 (which ends in March) and that listed wages of $2.211 million. **BUDAMALA** responded that the company had changed its name, but confirmed that each of his employees earned more than $100,000. On March 5, 2021, Newtek suspended **BUDAMALA**'s XC International account and did not fund the second draw.

  **e.   XC International second PPP loan**

31.   On March 19, 2021, **BUDAMALA** submitted an application to Amur Equipment and Finance for a second PPP loan on behalf of XC International. The application was similar to the second draw request **BUDAMALA** submitted to Newtek. **BUDAMALA** represented that XC International was located at the Park Center address, had 42

employees with an average monthly payroll of $737,000, was
established on April 17, 2019, used Azlo 5756 (which is
Hayventure's account), and earned $10.167 million of revenue in
2019 and $7,625,248 of revenue in 2020. **BUDAMALA** listed his
residence at the Park Center address, and represented that he
was the sole owner of XC International.

32.   In support of the loan **BUDAMALA** provided his
identification, a purported February 2020 XC International bank
statement for Azlo 5756 showing a beginning balance of
$2,219,720.63 and a payroll transaction of $737,000, Forms 941
for each quarter of 2020, purported copies of XC International's
Forms 1120 (corporate income tax returns) for 2019 and 2020, XC
International's Wyoming Secretary of State registration, the
forged letter from Azlo stating that XC International's bank
account ended in 5756, and profit and loss statements for XC
International dated October 1, 2020 and December 31, 2020 that
**BUDAMALA** signed.

33.   The February 2020 bank statement was forged. I
acquired the actual February 2020 statement for Azlo 5756. The
account was opened in the name of Hayventure (not XC
International), had a zero balance at the beginning of the
month, and had no transactions in February 2020. Moreover, as
described below, XC International has never filed a tax return,
nor is there any record of the company doing business in

Wyoming. The forged statement appears on the left, and the real statement appears on the right.



34. The Forms 941 **BUDAMALA** provided reflect that for each quarter, XC International had 42 employees and quarterly wages of $2.211 million. The forms also displayed **BUDAMALA**'s signature and reflected that he was the managing partner of XC International. The profit and loss statements appeared to be identical except for the dates. The only expense listed on the statements were wages, which conflicts with the Forms 1120 **BUDAMALA** provided for XC International, which report costs of goods sold, rent, advertising, and miscellaneous deductions. On March 24, 2021, Amur generated a promissory note for $1,842,500. **BUDAMALA** electronically signed the note the same day. On March 30, 2021, the loan proceeds were credited to Azlo 5756 (Hayventure).

### III. *IRS records*

35. In late 2021, an order pursuant to 26 U.S.C. § 6103(i) was served on the IRS for records pertaining to **BUDAMALA**, Hayventure, Pioneer, and XC International. The order requested tax returns and return information for the tax years 2019 to

2021. I provided the employer identification numbers ("EINs") for reference. In February 2022, the IRS responded that it had no records, including filed tax returns or Forms 941, for Hayventure, Pioneer, or XC International.

### IV.   *State employment records*

36.   I requested from the California Employment Development Department ("EDD") any records pertaining to Hayventure, Pioneer, or XC International, providing the EINs for reference. EDD had no record that **BUDAMALA**'s companies ever operated or paid wages in California.

37.   I also requested from the Wyoming Department of Revenue and the Wyoming Department of Workforce Security any records pertaining to Hayventure, Pioneer, and XC International, again providing the EINs for reference. The Wyoming departments had no records pertaining to **BUDAMALA**'s companies.

### V.   *Passport interview*

38.   **BUDAMALA** was born in Hyderbad, India in 1986. He has an Indian passport and was issued an H4 visa on June 21, 2019. The H4 was set to expire on September 18, 2021, but the State Department revoked the visa when **BUDAMALA** admitted that he submitted fraudulent documents to the government in support of a passport application.

39.   On February 19, 2021, a special agent from Diplomatic Securities Services interviewed **BUDAMALA.** When the agent asked **BUDAMALA** why he applied for the passport, **BUDAMALA** responded, "To get a job. I thought I would have a better chance of getting a job." **BUDAMALA** made this admission only a few days after

applying for the second draw on the Pioneer loan and before he applied for the second draw on the XC International loan.

## VI.  *Disposition of loan proceeds*

40.  In total, six SBA loans were disbursed to **BUDAMALA**'s companies worth $5,151,497. The proceeds moved through two business accounts at Azlo,[9] two personal accounts at Bank of America ("BOA"), two personal accounts at Citibank, a business account at Citibank, and a personal TD Ameritrade investment account.[10] The records show no substantial business revenue, payroll expenses, or other operating expenses. Instead, **BUDAMALA** used the majority of the money to fund the purchase of a $1.247 million investment property in Los Angeles, the purchase of a $597,585 property in Malibu, a $970,000 investment in an EB-5 fund, a $250,000 private placement investment, and a nearly $3 million investment in his TD Ameritrade account.[11]

### a.  **Azlo 7635 (Pioneer)**

41.  On June 9, 2020, **BUDAMALA** opened Azlo 7635, a business checking account in the name of Pioneer. Between the day **BUDAMALA** opened the account and March 17, 2021, **BUDAMALA** conducted 21 transactions with Azlo 7635, including the two SBA loan credits for $1.32 million (representing proceeds of the

---

[9] PNC Bank acquired Azlo in 2021.

[10] All of the accounts referred to in this affidavit are domiciled in the Central District of California.

[11] The figures in this section are based on a draft financial analysis and are subject to change as the investigation continues. Moreover, this section does not recount all evidence related to the financial accounts.

false SBA loans), a $400 payment for credit repair, and 16 transfers to **BUDAMALA**'s other bank accounts.

42.   No business income or expenses appear in the Azlo 7635 records, and on March 17, 2021, Azlo closed the account with a zero balance.

**b.   Azlo 5756 (Hayventure)**

43.   On March 4, 2019, **BUDAMALA** opened Azlo 5756, a checking account in the name of Hayventure.

44.   Between May 4, 2020 and March 30, 2021, there were only 17 credits to Azlo 5756, including two credits from TD Ameritrade totaling 45 cents to validate the account, and seven transfers from Azlo 7635 (Pioneer) totaling $1.035 million and the five PPP loan credits described in this affidavit totaling $3,831,497 (representing fraudulent SBA loan proceeds).

45.   **BUDAMALA** then transferred $2.835 million to TD Ameritrade 8743 (**BUDAMALA**), transferred $912,152.55 to Citibank 4850 (**BUDAMALA**), transferred $95,131.51 to unknown parties, made a $20,000 payment to Bluevine (Celtic's partner), and spent $11,313.19 on retailers, including Apple.com, Corporations Today, Expedia, BestBuy, Tempurpedic, Target, Amazon, and hotels (e.g., the Las Vegas Wynn Hotel).

46.   On March 31, 2020, Azlo 5756 was closed. At the time, the balance of the account was $992,500, which Azlo provided to **BUDAMALA** in the form of a cashier's check. **BUDAMALA** deposited that check, which represented fraudulent SBA loan proceeds, to Citibank 6558 (Hayventure) .

### c.   BOA 8343 and 7430 (BUDAMALA)

47.   On August 13, 2020, **BUDAMALA** signed the signature card for BOA 8343, which he opened in his own name. The reason why **BUDAMALA** dated the signature card in August 2020 is not clear since the activity begins on December 28, 2019.

48.   Nonetheless, between January 1, 2020 and October 25, 2021, the account had only three sources of funding: $505,000 from TD Ameritrade 8743, $19,000 from Citibank 4850 (**BUDAMALA**), and $83,379.04 from payroll and unknown deposits.

49.   Moreover, between January 1, 2020 and October 25, 2021, **BUDAMALA** used the money credited to BOA 8343 on what appear to be personal expenditures, including:

- $243,589.34 to BOA 7430 (**BUDAMALA**).

- $22,727.15 in credit card payments.

- $23,165.82 in what appear to be vehicle-related expenses.

- $93,475.81 via international wires or WorldRemit to an individual who appears to be **BUDAMALA**'s former spouse for "POP Family Support" and other unknown beneficiaries.

- $64,927.29 in what appear to be divorce expenses.

- $69,409.41 in domestic wires to unknown beneficiaries.

- $9,998 in payments to Gemini Trust, a known cryptocurrency platform.

- More than $40,000 in retail, service provider, travel, restaurant expenses, rent, utility and condominium expenses.

50.   The activity for the linked savings account, BOA 7430, began on December 28, 2019. Other than the money from the BOA

8343, only $1,908.68 went into BOA 7430. From the savings account **BUDAMALA** transferred $20,000 to Citibank 4850 (**BUDAMALA**), $4,000 to unknown beneficiaries, and $138,013.75 via international wire to a Bank of India account in **BUDAMALA**'s name that's domiciled in India.

### d.   Citibank 4850 and 3772 (BUDAMALA) and Citibank 6558 (Hayventure)

51.   On January 16, 2019, **BUDAMALA** opened Citibank 4850, a personal account. The account had only five sources of funding: $3.250 million from TD Ameritrade 8743 (**BUDAMALA**), $912,152.55 from Azlo 5756 (Hayventure), $175,000 from Azlo 7635 (Pioneer), $20,000 from BOA 7430 (**BUDAMALA**), and $14,737.30 in tax refunds and interest.

52.   **BUDAMALA** moved a large percentage of the money out of the account via the following wires and personal expenditures:

- $1,247,757.30 to First American Title Company (for "1857 Phillips Way" in Los Angeles). Records show that this expenditure was for the purchase of a property at 1857 Phillips Way in Los Angeles. The Phillips Way address is a single-family residence that **BUDAMALA** purchased as an investment property (**BUDAMALA** stated on closing documents that he would not reside in the home).

- $970,000 to CMB Infrastructure Investment Group 75 LP (for "Beneficiary EB5-Raghavender Reddy **BUDAMALA**"). Records show that CMB is a EB-5 investment fund of which **BUDAMALA** now owns 2.76 percent.

- $835,460.95 for the purchase of the Almond Tree residence. Records show that **BUDAMALA** closed this property on March 22, 2021, then made two wire transfers totaling $835,460.95 from Citibank 4850 (**BUDAMALA**) to purchase the Almond Tree residence.

- $595,965 to West Coast Escrow (for "Escrow Number 4510321-06240"). Records show that this expenditure is for the purchase of a property at 1300 Latigo Canyon Road in Malibu.

- $250,000 to NHK Mansfield, LP (for "Credit to **Raghavender BUDAMALA**"). Records show that NHK is a private placement investment.

- $69,999.96 to **BUDAMALA**'s Bank of India account, which is domiciled in India.

- $43,585.35 to Escrow Heights (for "Reference Information: 17327-CP").

- $25,993 to unknown beneficiaries.

- $150,000 in a 529 Investment Plan with the State of New York.

- More than $10,000 to miscellaneous retail, service providers, and restaurants.

53.   On May 7, 2021, **BUDAMALA** opened Citibank 3772, a personal savings account. The only sources of money that went into the account were $200,000 from Citibank 4850, $187,978.46 from Bluevine in refunded loan repayments, and $77.26 in earned interest. In terms of expenditures, **BUDAMALA** wired $39,999.97 from Citibank 3772 to his Bank of India account.

54.   On April 19, 2021, **BUDAMALA** opened Citibank 6558, a business account in the name of Hayventure. On the application, **BUDAMALA** reported to Citibank that Hayventure was located at the Bright Hollow address, the source of the money that went into Citibank 6558 was **BUDAMALA**'s savings, Hayventure had only one employee, and that the company earned $5 million in revenue and $2.5 million in net profits per year.

55.   Records show that Citibank 6558 had only two funding sources: $992,500 from Azlo 5756 (Hayventure) in the form of a cashier's check and $2,000 in interest. As described above, **BUDAMALA** derived the money credited to Azlo 5756 entirely from fraudulent SBA loan proceeds.

56.   From July 7, 2021 to November 30, 2021, **BUDAMALA** conducted 16 debit transactions from Citibank 6558 totaling $170,270.03, including:

- $156,426.37 in loan payments to Bluevine.

- $4,900.47 in apparently personal retail expenses.

- $4,200 in legal expenses to Mandarich Law Group LLP for "Trust T09."

- $4,743.19 in payments to software and technology expenses.

    **e.   TD Ameritrade 8743 (BUDAMALA)**

57.   On August 31, 2012, **BUDAMALA** opened TD Ameritrade 8743.[12] As of April 1, 2020, TD Ameritrade 8743 had a balance of $0.00. Between April 7, 2020 and March 30, 2021, TD Ameritrade 8743 only had two sources of funding. First, **BUDAMALA** transferred $144,000 into the account from Citibank 4850 (**BUDAMALA**). Second, **BUDAMALA** transferred $2.835 million into the account from Azlo 5756 (Hayventure). Thus, **BUDAMALA** derived all of the money that went into TD Ameritrade 8743 from SBA loans described in this affidavit.

---

[12] ScottTrade initially held the account under a different number. TD Ameritrade purchase ScottTrade in 2017 and assigned the current account number.

58.  **BUDAMALA** then executed a series profitable trades from TD Ameritrade 8743, and by the end of November 2021, using the stolen loan money, made in excess of $3.5 million. **BUDAMALA** has since transferred $505,000 from TD Ameritrade 8743 to BOA 8343 (**BUDAMALA**) and $3.25 million to Citibank 4850 (**BUDAMALA**).

### VII. *The Almond Tree search warrant*

59.  On February 23, 2022, agents executed a federal search warrant on the Almond Tree residence and encountered **BUDAMALA**. During the execution of the warrant, agents read **BUDAMALA** Miranda rights. **BUDAMALA** at first stated that he wanted to speak to an attorney about the SBA loans. In response, an agent told **BUDAMALA** that they would need to stop the interview, at which point **BUDAMALA** re-initiated contact with the agents and stated that he would talk about certain topics. The case agent then suggested a five minute break. After the break, **BUDAMALA** waived his right to counsel, and the agents commenced the interview.

60.  After **BUDAMALA** re-initiated the interview, **BUDAMALA** made a series of incriminating statements. In particular, **BUDAMALA** admitted that the SBA loans he filed in the names of Hayventure, Pioneer, and XC International were false, that his had no full-time employees, and that he spent the SBA loan proceeds on personal expenditures, including real estate and investment funds.

61.  Later on the night of February 23, 2022, **BUDAMALA** was detained when he attempted to abscond from the country via the San Ysidro border crossing.

### CONCLUSION

62.   Based on the foregoing, there is probable cause to issue the requested criminal complaint and arrest warrant.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _____ day of _____, 2022.

_____
THE HONORABLE
UNITED STATES MAGISTRATE JUDGE